UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------x

ALVIN ROGERS,

              Plaintiff,

   v.

FASHION INSTITUTE OF TECHNOLOGY, JOYCE F.
BROWN, STEVEN FRUMKIN, ERIC ODIN, GRISELDA
GONZALEZ, TAUR D. ORANGE and MARIO FEDERICI,
jointly and severally,

              Defendants.

-----------------------------------------------------------------------------x

**14 CV 6420**

<u>COMPLAINT</u>



Plaintiff, ALVIN ROGERS, individually, upon personal knowledge as to himself and upon information and belief as to other matters, alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.    This lawsuit is brought pursuant to Title VII of the Civil Rights Act of 1964, ("Title VII") as amended [race discrimination in employment], codified as 42 U.S.C. § 2000e *et seq.*; and Section 1981 of the Civil Rights Act of 1866, ("Section 1981"), codified as 42 U.S.C. § 1981, comprising plaintiff's federal claims. Plaintiff's New York State claims include the New York State Human Rights Law ("State Human Rights Law") regarding race discrimination in employment, codified as New York Executive Law § 290 *et seq.*; and New York City's Human Rights Law ("City Human Rights Law"), codified as Section 8-101 *et seq.* of the New York City Administrative Code.

2.    This lawsuit seeks declaratory and injunctive relief, and damages, arising from the intentional actions of defendants in discriminating against plaintiff based on his race.  Plaintiff is an adjunct professor with twelve (12) years of highly commended and

lauded experience in defendant Fashion Institute of Technology's ("FIT") employ in its Production Management Department ("the Department").  Plaintiff is African-American.

## JURISDICTION AND VENUE

3.    With respect to the federal claims ascertained herein, the Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) for the violation of plaintiff's federal statutory rights.

4.    Plaintiff's claim for declaratory relief is authorized under 28 U.S.C. §§ 2201 and 2202.

5.    With respect to the state law claims asserted herein, the Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a).

6.    Plaintiff filed the instant complaint within 90 days of receipt of a Notice of Right to Sue letter from the United States Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No. 520-2013-01836.

7.    The principal place of business of defendant FIT is 227 West 27th Street, New York, New York, and therefore, venue properly lies in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391.

## PARTIES

### PLAINTIFF

8.    Plaintiff, Alvin Rogers, is an African-American adult who is a citizen of the United States and resident of New York County, State of New York.

### DEFENDANTS

9.     FIT is empowered through State University of New York ("SUNY"), the University of the State of New York, and exists under the laws of the State of New York, and is therefore subject to the provisions of Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866; as well as the State Human Rights Law and the City Human Rights Law.  At all times relevant to this action, FIT has been plaintiff's employer within the meaning of the applicable laws.

10.     Defendant Joyce F. Brown has been the President of FIT at all times relevant to this action, and as such, is responsible for the operation of FIT and its departments.  Upon information and belief, defendant Brown has had direct control over all employment practices within FIT for all times relevant to this action.

11.     Defendant Steven Frumkin has been the Dean of Business and Technology at times relevant to this action, and as such, is responsible for the operation of the Department.  Upon information and belief, defendant Frumkin has had direct control over all employment practices within the Department for all times relevant to this action.

12.     Defendant Eric Odin has been the Director of FIT's Human Resources Services at all times relevant to this action, and as such, is responsible for investigating employment complaints within FIT.

13.     Defendant Griselda Gonzalez has been the Co-Chair of FIT's Diversity Council at all times relevant to this action, and as such, is responsible for investigating race discrimination complaints within FIT.

14.     Defendant Taur D. Orange has been the Director of FIT's Educational Opportunities Program (EOP) at all times relevant to this action, and as such, is responsible for the operation of the EOP.  Upon information and belief, defendant Orange

has had direct control over all employment practices within the EOP for all times relevant to this action.

15.     Defendant Mario Federici has been the chair of the Department at all times relevant to this action, and as such, is responsible for the operation of the Department. Upon information and belief, defendant Federici has had direct control over all employment practices within the Department for all times relevant to this action.

16.     Upon information and belief, at all times relevant to this complaint, each individual defendant has had, individually and jointly, substantial control over the terms and conditions of plaintiff's employment, including but not limited to, promotions, advancement opportunities, training and professional development, professional evaluation decisions, discipline and/or investigation of race discrimination.

## FACTUAL BACKGROUND

### Plaintiff's Successful Career in the Fashion Industry and Teaching at FIT

17.     Plaintiff Alvin Rogers is a 53-year old African-American male with a successful career and over a decade of teaching experience in the fashion industry. Prior to teaching at FIT, Rogers worked for seven (7) years in the fields of apparel merchandising, design and marketing. His clients in the fashion industry have included hip-hop artists such as Do or Die, for whom he provided fashions used in music videos and billboards.   Rogers also owned and operated Squiggly Rags, an apparel manufacturing company that sold clothing lines in major retail stores. He also created a suit collection called "Alvin Rogers," which sold at major popular retailers, such as Chicago retail giant Bigsby & Kruthers.

18.     In addition, Rogers has years of experience developing promotional and marketing strategies for his urban men's sportswear brand Peace Means Peace, and in designing the fashion layouts in popular music and hip hop magazines such as Source and Vibe.  He developed successful promotional pitches for Peace Means Peace to be distributed in several national and mainstream outlets, including JCPenney and Carson's.

19.     Rogers also developed marketing strategies for Follett's Higher Education Group, a nationwide bookstore provider, resulting in contracts to retail Black History Month products in over 125 stores.

20.     In August 2001, based on his experience in the production and fashion industry, Rogers was hired by FIT as a part-time adjunct professor in the Production Management Department ("the Department"), where he has been employed for over a decade, and is still currently employed as an adjunct professor.

21.     Since his time at FIT, over 90% of Rogers's total student course evaluations have scored above 4.5, which is considered excellent.  Specifically, out of 678 evaluations dating from 2001 to 2012, Rogers averaged a score of 4.74.

22.     Beginning in 2006 and 2007, Rogers wrote and developed courses in FIT's Entrepreneurship Program, including capstone courses on "The Entrepreneurial Incubator" and "Entrepreneurial Strategies & Development."

23.     Based on the high quality of his work in the Entrepreneurship Program, Rogers received a letter of recommendation from Chairman of Textile Marketing Jeffrey Silberman in February 2010.   In February 2010, Rogers also received a letter of recommendation highlighting his experience and work in the Entrepreneurship Program

5

from Robin Sackler, the former Chair of Fashion Merchandising and current Acting Dean of Business and Technology.

24.     In addition, for the past eight years, Rogers has been providing FIT's Educational Opportunities Program (EOP) with a workshop on production.   Until recently (the end of 2012 and beginning of 2013), Rogers was the only faculty member from the Production Management Department to be involved with the EOP.

25.     Based on his work in the EOP, Rogers in 2010 received a letter of recommendation from Taur Orange, the Director of the EOP.  Ms. Orange has considered Rogers to be highly qualified in his field, and over the years, has invited Rogers to EOP meetings and promoted his work.

**FIT's Environment of Racial Intimidation, and its Policies and Practices resulting in Plaintiff's Disparate Treatment concerning Evaluations, Faculty Advancement, Course Selections, Professional Development and Training**

26.     As provided in FIT's Policy Manual, the Office of Human Resources is charged with providing professional training opportunities to FIT faculty members. Upon information and belief, it is also customary for professors who wish to teach new courses to receive training and professional development in order to qualify to teach new courses. Furthermore, full-time employment opportunities within FIT's departments state minimum qualification requirements for its open positions, including the requirement of a bachelor's degree.

27.     Pursuant to FIT policy, each tenured faculty member, including faculty tenured via the Certificate of Continuous Employment (CCE), shall have student evaluations taken once every two (2) years; such evaluations are to be used for developmental purposes only.  If a professor scores below 4.5, the professor is reviewed

by the department chair and must be evaluated by the students again the following semester. If the professor scores below 4.5 the following semester, the professor is to be reviewed by both the department chair and the dean. If a professor receives student course evaluations below 4.0 at any point, he or she is to be automatically reviewed by the department chair and the dean. Upon information and belief, it is a custom and practice within the Department for the chair to offer career development to professors who score below 4.5 on student course evaluations, and only the dean, after an investigation, imposes any probation based upon these evaluations.

28.     In addition, FIT's protocol regarding student course evaluations is that a CCE tenured professor is to be evaluated every two years. An employee who is disciplined shall be furnished with a detailed written statement describing the cause requiring discipline by the Office of Human Resources.

29.     Upon information and belief, FIT does not follow its own procedures, but rather, gives the department chairs complete and unilateral authority in handling faculty evaluations, training and professional development, course selections, promotions, and hiring decisions. Confirming this practice, Rogers was told by the dean on at least one occasion that the department chair can "do whatever he wants" regarding these matters.

30.     Upon information provided by plaintiff, FIT has a historical policy and practice within the Department to offer career development to professors who score below 4.0 on student course evaluations, and only the dean, after an investigation, would impose any probation based upon these evaluations. However, upon information and belief, Department Chair Mario Federici imposed a different course of treatment on African-American faculty including plaintiff Rogers. Specifically, in 2003, based upon

the very first evaluation below 4.0 that Rogers had received, Federici unilaterally placed Rogers on probation, instead of following regular custom and practice.

31.     The adverse effect of probation was that Rogers would receive an inferior status in the department: i.e., he would not get to choose which courses to teach until after the entire faculty selected their courses.

32.     Upon information provided by plaintiff, similarly situated white faculty members have only been placed on probation following a dean's investigation, and have been offered career development.  However, it is the chair's usual procedure to place other non-white faculty members—including Rogers—on probation without a dean's investigation, not offer them career development, nor provide them with explanatory letters from Human Resources.

33.     Sometime at the beginning of 2004, Rogers attempted to gain full-time employment within the Department by applying for a position for which he was qualified. In particular, his colleague Mary Kassner told Rogers that his computer and production skills made him qualified for the position.  As chair of the Department, Federici was in charge of hiring for that position.  Rogers sent his application to Federici, including a video highlighting his computer and production skills.  At no time, however, did Federici interview or otherwise communicate with Rogers regarding his application for the position.  Federici eventually hired a less qualified white applicant for the position. Specifically, the applicant eventually hired did not even have a Bachelor's degree, although the job description required one.  Moreover, upon information and belief, FIT requires all full-time faculty members to possess at least Bachelor's degree.

34.     In the fall of 2004, after being passed up for the full-time position by a white candidate with lesser qualifications for the position, Rogers was eligible to be considered for CCE tenure. Rogers had previously provided proof to his Department of his credentials upon his initial employment to FIT in 2001; this included proof of his seven years of industry experience.   Rather than consider him for CCE tenure, on November 23, 2004, Federici informed Rogers that he would be fired if he could not prove that he had seven years of industry experience.

35.     Upon information and belief, FIT does not typically require professors to reprove their qualifications once they have been hired and it is deemed that they have already done so.   Specifically, and upon information provided by plaintiff, similarly situated white faculty members have not been required to reprove their qualifications after they have already been hired.   However, it has been the standard practice of the chair to require other non-white faculty members, including Rogers, to reprove their qualifications.

36.     Responding to Federici's demand to reprove his qualifications, on December 13, 2004, Rogers submitted to the Department a binder containing his credentials and data and documentation reproving his qualifications, including seven years of industry experience prior to his position with FIT.

37.     Rather than being provided with CCE tenure, and despite supplying proof of his industry experience, Rogers was terminated from the Department on January 11, 2005. Federici informed Rogers that he (Federici) and Human Resources had concluded that Rogers was not qualified.

38.     On January 12, 2005, Rogers spoke to Juan Nuñez from Human Resources.  Mr. Nuñez informed Rogers that Human Resources had concluded that Rogers was qualified, but that Federici had unilaterally altered the letter before it was sent to Rogers.

39.     On January 25, 2005, Dario Cortes, the Vice President for Academic Affairs, ordered defendant Federici to reinstate Rogers to all of the classes he had been teaching prior to his termination. Mr. Cortes based this decision on Rogers' credentials found in his file, and the fact that Federici had violated the provisions of the Collective Bargaining Agreement against unilateral actions.

40.     Upon information and belief, no action was ever taken against Federici or the Department for violating the provisions of the Collective Bargaining Agreement.

41.     After having been fired and then reinstated, in 2005, Rogers was finally approved for CCE tenure by the President of FIT.

42.     Also in 2005, Rogers became aware of another full-time position in production and computers for which he was qualified.  He informed defendant Federici that he intended to apply, but Federici flatly told him not to bother because Rogers was not qualified.  Therefore, Rogers did not apply.  Rogers later discovered that Linda Cohen, a white faculty member, was hired for the position despite the fact that she was not qualified in computers and the job description required qualification in both computers and production.

43.     Upon information and belief, other professors in the Department have made complaints to FIT about race being a factor in promotion and advancement, and complained of an environment where they were treated differently due to their race.  For

example, in 2006, Joyce Early, an African-American, sent a letter to Human Resources alleging and highlighting Federici's race-based practices in his hiring decisions. In particular, the letter noted that despite the presence of qualified non-white applicants, Federici hired a full-time position with a white applicant who did not even fulfill the requirement of having a bachelor's degree.

44.     In April 2008, Rogers interviewed for another full-time opening in production and computers for which he was qualified. The job description required qualification in both computers and production, areas in which Rogers was highly qualified. Rogers was aware that the procedure for interviewing for this specific position required that each candidate answer the exact same questions. However, despite the same hiring procedure purportedly applying equally to all candidates, Federici hired Mary Kassner, a white applicant with no experience in production.

**FIT's Environment of Systematically Ignoring Discrimination Complaints and instead Engaging in Retaliatory Conduct**

45.     On May 12, 2008, Mr. Rogers sent a letter to the hiring committee— including Linda Cohen, Ari Vega, Aaron Schorr, Steven Smith and defendant Federici— requesting an explanation as to why he was not hired for the full-time production position. Rogers also sent the letter to Griselda Gonzalez and Eric Ramirez in Human Resources. However, no one from the Hiring Committee or Human Resources ever replied or otherwise responded to Mr. Rogers's letter.

46.     Also in May 2008, Federici prevented Rogers from teaching a basic course in manufacture—a course which he was qualified to teach and which he had taught before, but for which he had received some low student course evaluations. Departing from FIT policy and its custom practice for white faculty members, Rogers was never

offered training or development for these low evaluations, nor was he given a letter from Human Resources explaining why he was considered ineligible to teach these courses. Federici's actions and inaction were also never reviewed by the Dean.

47.     In 2010, Rogers began voicing his concerns regarding the employment practices directed at non-white faculty members during faculty meetings, but was generally ignored by his superiors.  Rogers wanted to know what weight was given to student course evaluations after discovering that the Department re-hired previously terminated white professors who had much lower percentages of student course evaluations than Rogers.  Furthermore, Rogers became aware that white professors who routinely received low student course evaluations—including Aaron Schorr—were not placed on probation, disciplined, or otherwise punished as severely as Rogers and similarly situated non-white faculty members.

48.     On October 12, 2011, Rogers met with Eric Odin of Human Resources, Griselda Gonzalez of the Diversity Council, and Esther Oliveras of Faculty Services.  At the meeting, Rogers expressed his frustration at being denied full-time work and the ability to teach classes.  Rogers stated that he believed he was being discriminated against because of his race.  Mr. Odin acknowledged the disparate treatment, but said he did not believe it was based on race.  Mr. Odin advised Rogers that he would nevertheless undertake an investigation to ascertain whether the Department's failure to promote Rogers was based on racially discriminatory animus, and assured Rogers that he would be treated fairly in the future.

49.     On November 16, 2011, at Rogers' request, Rogers had a follow-up meeting with Mr. Odin and Ms. Gonzalez regarding the investigation. At this meeting,

12

Mr. Odin accused Rogers of "seeing everything through the lens of race" and suggested that Rogers apply to the next available full-time position. Mr. Odin also informed Rogers that if he really felt discriminated against, he should "sue the college".

50.     On November 17, 2011, Rogers met with Ms. Oliveras who informed Rogers that Mr. Odin's actions did not constitute an investigation, as all involved parties were not formally investigated or interviewed.

51.     Based on information supplied by his union in 2009 urging him to seek more training and to audit the courses for which he wished to receive training, Rogers pursued and acquired his Master's degree in 2012.

**Defendants' Work Environment in 2012 intimidated Plaintiff from applying for a full-time Position in the Department, being assigned courses for which he was qualified, and getting advanced training in the Department**

52.     In May 2012, Rogers met with Federici to again inquire about a full-time position within the Department. As he had acquired a Masters' degree several months before, Rogers advised Federici that he was qualified and had the requisite educational credentials.  Federici told Rogers that he was still not qualified.  When Rogers asked what more he could do to become a full-time employee with the Department, Federici flatly responded, "Nothing; you will never be qualified to work here full-time!"

53.     On May 21, 2012, Rogers had a meeting with the new dean, Steven Frumkin, and Federici.  During the meeting, Rogers informed Dean Frumkin that he had been denied courses and that Federici had consistently refused to promote Rogers based on the pretext that Rogers was not qualified for a full-time position in the Production Management Department.  Dean Frumkin said he would look into it.

54.    On July 14, 2012, Rogers complained to Dean Frumkin about race discrimination, and as a response, Dean Frumkin informed Rogers that his chairmen are permitted to "do what they want" and that Rogers should consider finding another job.

55.    On or about November 16, 2012, Rogers approached Aaron Schorr, a white professor in the Department, and asked if he could audit and receive training on the Web Production Data Management course co-authored by Mr. Schorr.   Mr. Schorr refused, although this is the practice at FIT for obtaining professional training.

56.    Toward the end of 2012, Mr. Schorr, who was less qualified than Rogers for the EOP position, was given three hours per day while Rogers was given only three hours per week, despite defendant Orange's previous assurances that Rogers would be given more courses within the EOP.

57.    Rogers approached Ms. Orange to inquire as to why Mr. Schorr was given three hours per day as opposed to Rogers' three hours per week.  Ms. Orange promised Rogers that he would be given a larger course load the next semester.  She also said she was aware that Rogers was being treated unfairly by the Department due to his discrimination complaints, in reference to Rogers' latest complaint to Dean Frumkin.

**FIT's Independent Climate Report Indicating its Policy and Practice of Failing to Investigate Race Discrimination, and Plaintiff's Subsequent Filing of a Continuing Violation Racial Discrimination Complaint with the EEOC**

58.    In the spring of 2013, Rankin & Associates Consulting, the firm tasked with conducting a Climate Report at FIT, concluded, *inter alia*, that "racial tension" in the environment posed an "opportunity for improvement" for FIT.

59.     During a meeting in the spring of 2013 in which Rogers and defendant Gonzalez were present, an employee of Rankin & Associates Consulting, stated that, "the reason FIT fails to investigate race discrimination is because of the donors."

60.     On April 11, 2013, due to the ongoing negative discriminatory practices affecting him within the Department, Rogers filed a charge with the EEOC alleging race discrimination by defendants.   On information and belief, each individual defendant became aware of the EEOC charge shortly after it was filed.

61.     On July 1, 2013, when the EOP courses started, Rogers was not given more courses to teach in the EOP.  On information and belief, Ms. Orange succumbed to pressure by the Department not to promote or advance Rogers due to his EEOC charge of race discrimination against the Department.

62.     In addition to complaining about race discrimination to defendants Frumkin, Odin and Gonzalez, Rogers has visited the office of defendant Brown on several occasions to voice his concerns with the fact that he was not being promoted or advanced.  During one conversation between Brown and Rogers, Rogers said, "maybe I don't fit in here," to which defendant Brown responded, "You mean because of your race? Race isn't the issue."  However, she did not offer an alternative reason that would explain the negative employment practices against Rogers, and failed to investigate Rogers's claims of race discrimination.

63.     Upon information and believe, the defendants' perpetration of a racially hostile environment includes policies and/or practices of restricting the promotion and advancement opportunities of plaintiff and other non-white faculty members so that they remain in lower classification and compensation levels.  Defendants, in effect, preclude

non-white faculty members from better and higher paying positions that have traditionally been held by white faculty members. The systematic means of accomplishing such race stratification include, but are not limited to, defendants' promotion, advancement, training and performance evaluation policies, practices and/or procedures, as well as defendants' failure to adequately investigate or otherwise address complaints of race discrimination.

64.     In creating and maintaining a racially hostile environment, defendants have incorporated the following discriminatory practices: (a) relying upon subjective judgments, procedures and criteria which permit and encourage the incorporation of race bias by defendants' predominantly white managerial and supervisory staff in making promotion, training, performance and evaluation decisions; (b) refusing or failing to provide equal training and professional development opportunities to non-white faculty members; (c) refusing or failing to establish and/or follow policies, practices, procedures or criteria that reduce or eliminate disparate treatment and/or intentional race bias; (d) using informal, subjective selection methods which allow for race discrimination; (e) disqualifying non-white faculty members for vacancies by unfairly disciplining them; (f) discouraging job applications by non-white faculty members; and (g) failing to investigate or otherwise adequately address race discrimination.

65.     Plaintiff has suffered economic, emotional, and physical harm, including physical manifestations of stress due to the racially hostile work environment, and is under the care of a physician who has diagnosed him with Post-Traumatic Stress Disorder (PTSD).

**FIRST CLAIM**

**VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e, *et seq*., AS AMENDED**

**(DISCRIMINATION IN EMPLOYMENT)**

66.     Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

67.     Since 2003 and continuing to the present day, defendants have discriminated against Plaintiff on the basis of his race, color and/or national origin in violation of Title VII by repeatedly denying him equal terms and conditions of employment, including, but not limited to, subjecting him to disparate working conditions, policies and practices that repeatedly intimidated the plaintiff and denied him the opportunity to work in an environment free of unlawful discrimination.  The repeated discriminatory actions of the defendants include, but are not limited to, intimidation, preventing plaintiff from making course selections, preventing plaintiff from advancing and seeking career growth opportunities within the department, and ignoring plaintiff's complaints of discrimination.  Such intimidation, unfair policies, and practices were not experienced by similarly situated white faculty members and job applicants.

68.     Through its repeated actions and inaction, defendants have discriminated against Plaintiff on the basis of race, color, and/or national origin in violation of Title VII by creating, fostering, condoning, and/or otherwise failing to prevent or remedy a hostile work environment in the department that included, *inter alia*, severe, pervasive, and repeated discrimination against the plaintiff—a discrimination not experienced by similarly situated white faculty members and applicants in the department.

69.     The effect of the practices complained of above has been to deprive plaintiff of equal employment opportunities and to otherwise adversely affect his status as an employee on the basis of race.

70.     As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered, and continues to suffer, monetary and/or economic harm—including loss of compensation, wages, back pay, and employment benefits; plaintiff has also, as a result, suffered from mental, emotional and physical harm, anguish and humiliation.   Thus, plaintiff is entitled to an award of money damages and other relief.

71.     As defendants have failed to investigate or otherwise address his complaints of race discrimination, plaintiff has no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein. Plaintiff now suffers irreparable injury from defendants' unlawful policies, practices and/or procedures as set forth herein, and will continue to suffer unless those policies, practices and/or procedures are enjoined by this Court.  This suit is his only means of securing adequate relief.

72.     By reason of race discrimination suffered at FIT, plaintiff is entitled to all legal and equitable remedies available under Title VII.

73.     Defendants' unlawful employment practices were, and are, intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of plaintiff's rights under Title VII.  Thus, plaintiff is entitled to an award of punitive damages.

## SECOND CLAIM
## VIOLATIONS OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981, *et seq.*

### (DISCRIMINATION IN EMPLOYMENT)

74.     Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

75.     By the acts and practices described above, defendants have discriminated against plaintiff on the basis of his race, color and/or national origin in violation of 42 U.S.C. § 1981 by repeatedly denying him equal terms and conditions of employment, including, but not limited to, subjecting him to disparate working conditions, policies and practices that repeatedly intimidated the plaintiff and denied him the opportunity to work in an environment free of unlawful discrimination.  The repeated discriminatory actions of the defendants include, but are not limited to, intimidation, preventing plaintiff from making course selections, preventing plaintiff from advancing and seeking career growth opportunities within the department, and ignoring plaintiff's complaints of discrimination.  Such intimidation, unfair policies, and practices were not experienced by similarly situated white faculty members and job applicants.

76.     The effect of the practices complained of above has been to deprive plaintiff of equal employment opportunities and to otherwise adversely affect his status as an employee on the basis of race.

77.     As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered, and continues to suffer, monetary and/or economic harm—including loss of compensation, wages, back pay, and employment benefits; plaintiff has also, as a result,

suffered from mental, emotional and physical harm, anguish and humiliation. Thus, plaintiff is entitled to an award of money damages and other relief.

78.     As defendants have failed to investigate or otherwise address plaintiff's complaints of race discrimination, plaintiff has no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein. Plaintiff now suffers irreparable injury from defendants' unlawful policies, practices and/or procedures as set forth herein, and will continue to suffer unless those policies, practices and/or procedures are enjoined by this Court. This suit is his only means of securing adequate relief.

79.     By reason of race discrimination suffered at FIT, plaintiff is entitled to all legal and equitable remedies available under Section 1981, including compensatory damages, reasonable attorney's fees and costs of this action, and pre-judgment interest, all in the amount to be determined at trial.

80.     Defendants' unlawful employment practices were, and are, intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of plaintiff's rights under Section 1981. Thus, plaintiff is entitled to an award of punitive damages.

### THIRD CLAIM
### VIOLATIONS OF NEW YORK STATE HUMAN RIGHTS LAW
### N.Y. State Human Rights Law Exec. § 296.

### (DISCRIMINATION IN EMPLOYMENT)

81.     Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

82.     N.Y. State Human Rights Law E.L. § 296(1) prohibits the discrimination in employment based on race.

83.     By the acts and practices described above, defendants have discriminated against Plaintiff on the basis of his race, color and/or national origin in violation of New York State Human Rights Law by repeatedly denying him equal terms and conditions of employment, including, but not limited to, subjecting him to disparate working conditions, policies and practices that repeatedly intimidated the plaintiff and denied him the opportunity to work in an environment free of unlawful discrimination. The repeated discriminatory actions of the defendants include, but are not limited to, intimidation, preventing plaintiff from making course selections, preventing plaintiff from advancing and seeking career growth opportunities within the department, and ignoring plaintiff's complaints of discrimination. Such intimidation, unfair policies, and practices were not experienced by similarly situated white faculty members and job applicants. The effect of the practices and environment complained of above has been to deprive plaintiff of equal employment opportunities and to otherwise adversely affect his status as an employee on the basis of race. As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered, and continues to suffer, monetary and/or economic harm—including loss of compensation, wages, back pay, and employment benefits; plaintiff has also, as a result, suffered from mental, emotional and physical harm, anguish and humiliation. Thus, plaintiff is entitled to an award of money damages and other relief.

84.     As defendants have failed to investigate or otherwise address plaintiff's complaints of race discrimination, plaintiff has no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein. Plaintiff now suffers irreparable injury from defendants' unlawful policies, practices and/or procedures as set

forth herein, and will continue to suffer unless those policies, practices and/or procedures are enjoined by this Court.  This suit is his only means of securing adequate relief.

85.    By reason of race discrimination suffered at FIT, plaintiff is entitled to all legal and equitable remedies available under New York State Human Rights Law.

86.    By reason of intentional, deliberate, willful, malicious and reckless race discrimination suffered at FIT, plaintiff is entitled to all legal and equitable remedies available under New York State Human Rights Law, all in the amount to be determined at trial.

**FOURTH CLAIM**
**VIOLATIONS OF NEW YORK CITY HUMAN RIGHTS LAW**
**New York City Administrative Code, § 8-107 *et seq.***

**(DISCRIMINATION IN EMPLOYMENT)**

87.    Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

88.    N.Y.C. Admin. Code § 8-107 *et seq.* prohibits the discrimination in the terms and conditions of employment based on race.  Defendants' employment practices at issue were not visited on similarly situated white employees.

89.    By the acts and practices described above, defendants have discriminated against Plaintiff on the basis of his race, color and/or national origin in violation of New York City Human Rights Law by repeatedly denying him equal terms and conditions of employment, including, but not limited to, subjecting him to disparate working conditions, policies and practices that repeatedly intimidated the plaintiff and denied him the opportunity to work in an environment free of unlawful discrimination.  The repeated discriminatory actions of the defendants include, but are not limited to, intimidation,

preventing plaintiff from making course selections, preventing plaintiff from advancing and seeking career growth opportunities within the department, and ignoring plaintiff's complaints of discrimination.  Such intimidation, unfair policies, and practices were not experienced by similarly situated white faculty members and job applicants.

90.     The effect of the practices complained of above has been to deprive plaintiff of equal employment opportunities and to otherwise adversely affect his status as an employee on the basis of race.  As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered, and continues to suffer, monetary and/or economic harm—including loss of compensation, wages, back pay, and employment benefits; plaintiff has also, as a result, suffered from mental, emotional and physical harm, anguish and humiliation.  Thus, plaintiff is entitled to an award of money damages and other relief.

91.     As defendants have failed to investigate or otherwise address plaintiff's complaints of race discrimination, plaintiff has no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein.  Plaintiff now suffers irreparable injury from defendants' unlawful policies, practices and/or procedures as set forth herein, and will continue to suffer unless those policies, practices and/or procedures are enjoined by this Court.  This suit is his only means of securing adequate relief.

92.     By reason of race discrimination suffered at FIT, plaintiff is entitled to all legal and equitable remedies available under New York City Human Rights Law, including compensatory damages, reasonable attorney's fees and costs of this action, and pre-judgment interest, all in the amount to be determined at trial.

93.     The unlawful employment practices were, and are, intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of plaintiff's rights under New York City Human Rights Law.  Thus, plaintiff is entitled to an award of punitive damages.

## FIFTH CLAIM
### VIOLATIONS OF NEW YORK STATE HUMAN RIGHTS LAW
### N.Y. State Human Rights Law Exec. § 296.

### (AIDING AND ABETTING DISCRIMINATION IN EMPLOYMENT)

94.     Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

95.     N.Y. State Human Rights Law E.L. § 296(1) prohibits the discrimination in employment based on race.

96.     By the acts and practices described above, defendants Brown, Frumkin, Federici, Odin, Gonzalez and Orange acting as aiders and abettors, discriminated against plaintiff in the terms and conditions of his employment on the basis of race, in violation of N.Y. State Human Rights Law Executive Law § 296(6).

97.     The effect of the practices complained of above has been to deprive plaintiff of equal employment opportunities and to otherwise adversely affect his status as an employee on the basis of race.  As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered, and continues to suffer, monetary and/or economic harm—including loss of compensation, wages, back pay, and employment benefits; plaintiff has also, as a result, suffered from mental, emotional and physical harm, anguish and humiliation.  Thus, plaintiff is entitled to an award of money damages and other relief.

98.     By reason of intentional, deliberate, willful, malicious and reckless race discrimination suffered at FIT, plaintiff is entitled to all legal and equitable remedies available under New York State Human Rights Law, all in the amount to be determined at trial.

### SIXTH CLAIM
### VIOLATIONS OF NEW YORK CITY HUMAN RIGHTS LAW
### New York City Administrative Code, § 8-107 *et seq.*

### (AIDING AND ABETTING DISCRIMINATION IN EMPLOYMENT)

99.     Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

100.    N.Y.C. Admin. Code § 8-107 *et seq.* prohibits the discrimination in the terms and conditions of employment based on race.  Defendants' employment practices at issue were not visited on similarly situated white employees.

101.    By the acts and practices described above, defendants Brown, Frumkin, Federici, Odin, Gonzalez and Orange acting as aiders and abettors, discriminated against plaintiff in the terms and conditions of his employment on the basis of race, in violation of N.Y.C. Admin. Code § 8-107(6).

102.    The effect of the practices complained of above has been to deprive plaintiff of equal employment opportunities and to otherwise adversely affect his status as an employee on the basis of race.

103.    By reason of race discrimination suffered at FIT, plaintiff is entitled to all legal and equitable remedies available under New York City Human Rights Law.

104.    Defendants' unlawful employment practices were, and are, intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of plaintiff's

rights under New York City Human Rights Law.  Thus, plaintiff is entitled to an award of punitive damages.

## SEVENTH CLAIM
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.*, AS AMENDED

### (RETALIATION)

105.    Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

106.    Defendant FIT retaliated against plaintiff because he insisted upon a work environment free of race discrimination and also because he complained about race discrimination to Dean Frumkin and the EEOC.

107.    Defendants retaliated against plaintiff by subjecting him to adverse employment actions, including but not limited to, denying him promotions for which he was qualified, subjecting him to disparate terms and conditions of employment and race discrimination in violation of Title VII.

108.    As a direct and proximate result of defendants' aforementioned conduct, plaintiff was damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

109.    By reason of the retaliation suffered by defendants, plaintiff is entitled to all legal and equitable remedies available under Title VII.

110.    Defendants' unlawful employment practices were, and are, intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of plaintiff's rights under New York City Human Rights Law.  Thus, plaintiff is entitled to an award of punitive damages.

## EIGHTH CLAIM
## VIOLATIONS OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1866,
## 42 U.S.C. § 1981 *et seq.*

### (RETALIATION)

111.    Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

112.    All defendants retaliated against plaintiff because he insisted upon a work environment free of race discrimination and also because he complained about race discrimination to Dean Frumkin and the EEOC.

113.    Defendants retaliated against plaintiff by subjecting him to adverse employment actions, including but not limited to, denying him promotions for which he was qualified, subjecting him to disparate terms and conditions of employment and race discrimination in violation of Section 1981.

114.    As a direct and proximate result of defendants' aforementioned conduct plaintiff was damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

115.    By reason of the retaliation suffered by defendants, plaintiff is entitled to all legal and equitable remedies available under Section 1981.

116.    Defendants' actions were intentional, deliberate, willful, malicious, reckless and conducted with callous disregard of causing harm to plaintiff.    Thus, plaintiff is entitled to an award of punitive damages.

### NINTH CLAIM
### VIOLATIONS OF NEW YORK STATE HUMAN RIGHTS LAW
### N.Y. State Human Rights Law Exec. § 296(e)

### (RETALIATION)

117.    Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

118.    All defendants retaliated against plaintiff because he insisted upon a work environment free of race discrimination and also because he complained about race discrimination to Dean Frumkin and the EEOC.

119.    Defendants retaliated against plaintiff by subjecting him to adverse employment actions, including but not limited to, denying him promotions for which he was qualified, subjecting him to disparate terms and conditions of employment and race discrimination in violation of N.Y.S.H.R.L. § 296(e).

120.    As a direct and proximate result of defendants' aforementioned conduct plaintiff was damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

121.    By reason of the intentional, deliberate, willful, malicious and reckless retaliation suffered by defendants, plaintiff is entitled to all legal and equitable remedies available under N.Y.S.H.R.L. § 296 *et seq*.

## TENTH CLAIM
### VIOLATIONS OF NEW YORK CITY HUMAN RIGHTS LAW
### New York City Administrative Code, § 8-107(7)

### (RETALIATION)

122.    Plaintiff repeats, realleges and incorporates each and every preceding paragraph as if set forth fully herein.

123.    Defendants Brown, Frumkin, Federici, and Orange retaliated against plaintiff because he insisted upon a work environment free of race discrimination and also because he complained about race discrimination to Dean Frumkin and the EEOC.

124.    Defendants retaliated against plaintiff by subjecting him to adverse employment actions, including but not limited to, denying him promotions for which he was qualified, subjecting him to disparate terms and conditions of employment and race discrimination in violation of N.Y.C. Admin. Code § 8-107(7).

125.    As a direct and proximate result of defendants' aforementioned conduct plaintiff was damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

126.    By reason of the retaliation suffered by defendants, plaintiff is entitled to all legal and equitable remedies available under N.Y.C. Admin. Code § 8-101 *et seq*.

127.    Defendants' unlawful employment practices were, and are, intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of plaintiff's rights under New York City Human Rights Law.  Thus, plaintiff is entitled to an award of punitive damages.

## RELIEF SOUGHT

**WHEREFORE**, plaintiff respectfully request that this Court issue:

A.  An order and decree that defendants have violated Title VII of the Civil Rights Act of 1964, and Section 1981 of the Civil Rights Act of 1866, and have done so willfully;

B.  An order and decree that defendants have violated the N.Y. State Human Rights Law and the N.Y. City Human Rights Law, and have done so willfully;

C.  An award to plaintiff in compensatory and punitive damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants'

29

violation of plaintiff's rights under Title VII of the Civil Rights Act of 1964 for race discrimination in an amount to be determined at trial;

D. An award to plaintiff in compensatory and punitive damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiff's rights under Section 1981 of the Civil Rights Act of 1866 for race discrimination in the terms and conditions of plaintiff's employment in an amount to be determined at trial:

E. An award to plaintiff in compensatory damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiff's rights under the New York State Human Rights Law in an amount to be determined at trial;

F. An award to plaintiff in compensatory and punitive damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiff's rights under the New York City Human Rights Law in an amount to be determined at trial;

G. An injunction against defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

H. An award for the costs of this action, together with reasonable attorney's fees, as provided by 42 U.S.C. § 2000e-5(k), N.Y.C. Admin. Code, § 8-120 and as provided by 42 U.S.C. § 1988; and;

I. Such additional equitable and legal relief as the Court deems just and proper in the circumstances.

## **JURY TRIAL**

Plaintiff demands a jury trial for all causes of action and claims for which they have a right to a jury trial.

Dated: New York, New York
      July 9, 2014

Respectfully submitted,

ALVIN ROGERS

By: Alvin Rogers
Plaintiff, appearing *Pro Se*

31